UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RYAN CALLAHAN,

    Plaintiff,

vs.                                                                                             Case No. 12-10774

HARTLAND CONSOLIDATED SCHOOLS,                      HON. AVERN COHN
LIVINGSTON COUNTY, and JAMES
STEINAWAY,

    Defendants.

_____/

**MEMORANDUM AND ORDER GRANTING DEFENDANT
HARTLAND'S MOTION FOR SUMMARY JUDGMENT (Doc. 31)
AND GRANTING DEFENDANT LIVINGSTON COUNTY'S AND
STEINAWAY'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. 33)**

**I. INTRODUCTION**

This is a § 1983 and intentional tort case arising out of an altercation between a student, plaintiff Ryan Callahan (Callahan), and defendant James Steinaway (Steinaway), a deputy sheriff with the Livingston County Sheriff's Department and the Hartland High School's Student Resource Officer (SRO). Callahan is suing (1) Steinaway, (2) the school district, Hartland Consolidated Schools (Hartland), and (3) the county, Livingston County (Livingston). The following five counts in Callahan's first amended complaint[1] still remain:

    Count I        Assault and Battery (Steinaway);

---

[1] In an Order Denying Defendant Hartland's Motion to Dismiss (Doc. 24), the Court dismissed two counts of malicious prosecution (counts III and V) and limited Callahan's false imprisonment claim (count II) to Steinaway. The Court directed Callahan to file an amended complaint.

Count II      False Imprisonment (Steinaway)²;

Count IV     42 U.S.C. § 1983 - Excessive Force (Steinaway);

Count VI     42 U.S.C. § 1983 - Failure to Supervise (Hartland); and

Count VII    42 U.S.C. § 1983 - Failure to Supervise (Livingston).

Now before the Court is (1) Hartland's motion for summary judgment (Doc. 31), and (2) Livingston and Steinaway's motion for partial summary judgment on counts II (false imprisonment) and VII (failure to supervise) (Doc. 33). For the reasons that follow, both motions will be granted.³ The case will proceed against Steinaway only on counts I (assault and battery) and IV (excessive force).

## II. BACKGROUND

On September 17, 2010, Callahan attended a high school football game with his sister and her friend at Hartland High School, where he was a student, in Livingston County, Michigan. School aides Ihlene Gordinear (Gordinear) and Estelle Lashbrook (Lashbrook) were performing security duties and assisting with crowd control.⁴ They were stationed at different locations.

On this particular night, a person attending the football game was found laying face

---

² Callahan's amended complaint includes Livingston on this count. The Court dismissed Livingston; this claim only applies to Steinaway.

³ Livingston and Steinaway also have a pending motion *in limine* (Doc. 44). This motion is not in the purview of this Memorandum and Order.

⁴ Gordinear was hired by a third party management company to perform services at Hartland High School athletic events; she has been working "concessions," "security," and the "ticket booth" for seven years (Doc. 47-3, p. 4). Lashbrook has worked at football games assisting in "crowd control, concession stands, and running things up to the press box" for eight years (Doc. 47-2, pp. 4-5).

down on the ground (Doc. 47-2, p. 8; Doc. 47-3, p. 7). Emergency medical services were summoned (Doc. 47-2, p. 8; Doc. 47-3, p. 7).[5] While waiting for an ambulance,[6] Lashbrook and Gordinear helped to keep the crowd back and away from the injured person (Doc. 47-2, p. 8; Doc. 47-3, p. 7). There were a number of people walking back and forth, and despite Lashbrook's best efforts, some of them were making it past her (Doc. 47-2, p. 9-10).

Callahan says he became "upset" when he saw the ambulance and decided to walk "[o]utside of the football game; maybe up to school, you know, use the drinking fountain, stuff like that" (Doc. 50-6, p. 24). Callahan first walked by Gordinear. Gordinear says she told Callahan that he could not walk in the direction he was headed, towards the person who was laying on the ground (Doc. 47-3, p. 10). According to Gordinear, Callahan told her that he had to use the bathroom (Id.). After Gordinear told Callahan, "I'm sorry, but I can't let you through," she says he pushed her (Id.). She was not injured, but her "feelings were hurt" (Id. at 13). Callahan has a different story. He says that, as he was walking with his head down, Gordinear grabbed his shoulder and told him he could not walk near the grass because someone was injured and laying on the ground (Doc. 50-6, pp. 23-24). Callahan denies pushing Gordinear; she did not report the incident that night.

As Callahan continued to walk he reached Lashbrook. Lashbrook says she repeatedly told him to "please stop" (Doc. 47-2, p. 10). Callahan admitted that Lashbrook

---

[5] No one seems to know exactly why this person was laying face down on the ground but two other officers at the football field were conducting an assault investigation.

[6] The assistant principal, Alice Lashbrook, stated that an ambulance was also called for a student who was intoxicated (Doc. 50-4, p. 9).

3

told him not to walk in the direction he was headed (Doc. 50-6, p. 25). Rather than stop, Lashbrook says Callahan continued a "brisk walk," pushed her, and she ended up hitting the fence behind her (Doc. 47-2, p. 10). Lashbrook did not know if the push was purposeful, "but it was a push to keep going, [Callahan] wanted to leave the game – or go somewhere. . ." (Id.). Lashbrook says she was thrown backwards and her arm was pinched between the fence. She says she stood up and held her arm up because it was in pain: "I mean, it hurt not really bad, but it hurt. And I said, 'I can't believe he pushed me.' And that was it. And I stayed there with the crowd" (Id. at 11). She says Callahan then continued to walk away until Steinaway stopped him (Id.).

Callahan has a different account of his encounter with Lashbrook. Callahan says that after Lashbrook told him he could not walk in the direction he was headed, he began to walk a route he thought was appropriate (Doc. 50-6, p. 25). Notwithstanding, he says Lashbrook "jump[ed] in front of [him] and pushe[d] her hands up" (Id.). Callahan says that he may have accidently bumped Lashbrook: "Well it's hard to say, because she jumped in front of me. I don't know if you'd classify that as her having contact with me or me having contact with her" (Id.). Callahan says that when Lashbrook stood up, she said, "Don't push me" (Id. at 27). Callahan says he responded, "Oh, I'm sorry, I didn't realize I did. And then she yelled and says, Didn't you see I was wearing this freaking yellow jacket" (Id.). Callahan says he informed Lashbrook that he needed to leave because he was upset (Id.). He says Lashbrook then "yelled" for someone to help (Id.). Callahan says he stopped when this happened (Id.).

Steinaway, wearing a blue polo with a Livingston County Sheriff's deputy logo, approached Callahan and began talking to him (Doc. 47-2, p. 15; Doc. 50-6, p. 28).

4

Steinaway asked Lashbrook what was going on (Doc. 50-6, p. 28). Lashbrook told Steinaway that Callahan was trying to leave (Id.). Steinaway instructed Callahan to leave (Id.).

After Callahan began walking away, Lashbrook told Steinaway that Callahan pushed her (Doc 47-2, p. 15, Doc. 50-7, p. 38). Steinaway and Lashbrook say Steinaway saw a visible scratch on her arm from where she had hit the fence (Doc 47-2, p. 15, Doc. 50-7, p. 38). Both say Steinaway then asked Callahan to stop more than once in a "very loud" voice (Doc. 47-2, pp. 15-16; Doc. 50-7, p. 38-41). Callahan says he did not hear Steinaway's command (Doc. 50-6, p. 30).[7] Steinaway began to pursue Callahan, who had his back to Steinaway. Steinaway says he had to sprint to catch up with Callahan (Doc. 50-7, p. 42-43). When Steinaway caught up with Callahan, he "grabbed him by the shoulders. I had – as I was running up to him, I was yelling, 'Stop. Police,' in a loud – loudly, so he could hear me, and when I got up to him I grabbed him by the shoulders and we both fell to the ground holding onto his arm" (Id. at 43). Callahan says this was the first time he knew Steinaway was pursuing him– when he "tackled" him to the ground (Doc. 50-6, p. 30).

Steinaway secured Callahan while two other officers who were working at the game came to Steinaway's aide and helped place Callahan in handcuffs (Doc. 50-6, p. 35). Callahan says that, as this was going on, he was saying, "Stop, what are you doing" (Id. at 32). He says that his head was slammed on the ground (Id.). Steinaway denies this.

Callahan was taken by police car to the high school building to speak with Alice

---

[7] Callahan says he has had trouble hearing out of one ear since birth. He also questions whether Steinaway actually asked him to stop.

5

Lashbrook (Alice)[8], the assistant principal of the school (Doc. 50-6, pp. 36, 38).  When they got to the office, Alice asked Steinaway and Callahan, " 'What happened? Why is he here?' at which point in time [Callahan] sat down in the chair opposite of the desk, and Deputy Steinaway informed me that [Callahan] was running away – or no, I'm sorry, that [Callahan] had hit an employee" (Doc. 50-4, p. 10).  Alice says that Callahan was still in handcuffs and she noticed that "[h]e looked flustered.  He looked sweaty.  But I did not immediately notice if he was crying" (Id.).

According to Callahan, Alice then dismissed Steinaway from the room because he got in Callahan's face "and starts yelling and spitting on me [Callahan], saying that, I can take you to juvy right now, and do you understand.  And I say, Yes, I understand, okay" (Doc. 50-6, p. 38).  Alice says Callahan and Steinaway had a "little interaction between the two, verbal, as they were both trying to tell me what's going on" (Doc. 50-4, p. 12).  "What I [Alice] can recall of the interaction is that I had asked what was going on.  Deputy Steinaway started to speak. [Callahan] interjected by saying, 'No, that's not the case.' Deputy Steinaway started yelling at [Callahan], and then that's when I said, 'Step out of the room.  Let me talk with [Callahan]' " (Id.).

After Steinaway left the room, Alice says she immediately asked Callahan what happened, to which he responded that "he wasn't quite sure; that he was just trying to leave.  And next thing he knew he was being tackled to the ground" (Doc. 50-4, p. 10).  Alice had Steinaway return to the room and remove Callahan's handcuffs because Callahan complained that they were on too tight (Doc 50-4, p. 10; Doc. 50-6, p. 38).

---

[8] Alice and Estelle Lashbrook are not related.

Callahan's parents arrived. Alice informed them of what Steinaway told her and Callahan's version of events (Doc. 50-4, p. 13). She informed Callahan and his parents that Callahan was suspended for ten days and that the school would hold an expulsion hearing (Doc. 50-6, pp. 39-40; Doc. 50-4, p. 13).

Shortly after Callahan and his parents left, Callahan's mother returned to Alice's office to inform her that Callahan may have hit his head on the concrete and that she planned to take him to the hospital (Doc. 50-4, p. 14). She told Alice that "the sheriff [Steinaway] better be ready for this" (Id.).

The school officials decided not to recommend Callahan's expulsion. Callahan did not return to school after his suspension; he was allowed to complete online course work and he ultimately transferred to an alternative school.

Callahan was charged in state court with (1) assault on a police officer and resisting and obstructing; (2) two counts of assault and battery; and (3) trespass. Pursuant to a plea agreement with the prosecutor, Callahan pled in state court to "disorderly conduct - jostling" and the other charges were dismissed (Doc. 12-3). Callahan was placed on standard probation for six months (Id. at 5).

### III. LEGAL STANDARDS

### A. Summary Judgment

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587

(1986). The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set out specific facts showing a genuine issue for trial." Chappell v. City of Cleveland, 585 F.3d 901, 906 (6th Cir. 2009). The Court must "view the facts in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences." King v. Taylor, 694 F.3d 650, 661 (6th Cir. 2012) (citation omitted). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

### B. Municipal Liability

A municipality may not be held liable under § 1983 based on the theory of respondeat superior. Connick v. Thompson, 131 S.Ct. 1350, 1359 (2011) (citations omitted). In order for municipal liability to attach, a plaintiff must show that "a custom, policy, or practice attributable to the municipality was the 'moving force' behind the violation of plaintiff's constitutional rights." Heyerman v. Cnty. of Calhoun, 680 F.3d 642, 648 (6th Cir. 2012) (citing Miller v. Sanilac Cnty., 606 F.3d 240, 254-55 (6th Cir. 2010)). In other words, municipal liability only attaches when the plaintiff (1) identifies a municipal policy or custom, (2) connects the policy or custom to the municipality, and (3) shows that his injury was incurred because of the policy or custom. Alkire v. Irving, 330 F.3d 802, 814-15 (6th Cir. 2003).

"To succeed on a failure to train or supervise claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." Ellis ex rel. Pendergrass v. Cleveland Mun. School. Dist., 455 F.3d 690, 700 (6th Cir. 2006) (citing Russo v. City of

8

Cincinnati, 953 F.2d 1036, 1046 (6th Cir. 1992)). "The occasional negligent administration of an otherwise sound policy is not sufficient to impose municipal liability." Heyerman, 680 F.3d at 648. (citation omitted).

Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of [its] action." Heyerman, 680 F.3d at 1361 (citing Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 410 (1997) (internal quotations omitted). A plaintiff has two methods for demonstrating that a municipality was deliberately indifferent to his constitutional needs. Id. at 648-49. First, deliberate indifference can be established by presenting evidence "showing that the municipality possessed actual knowledge indicating a deficiency with the existing policy or training (or lack thereof), such as where there have been recurring constitutional violations." Id. at 648 (citing Oviatt v. Pearce, 954 F.2d 1470, 1473, 1477-78 (9th Cir. 1992)). Second, deliberate indifference can be shown by demonstrating that the "need to act should have been plainly obvious to the [municipality's] policymakers. . . . Heyerman, 680 F.3d at 649 (citation and internal quotations omitted) (alteration in original). In a "narrow range of circumstances," the "unconstitutional consequences of failing to train could be so patently obvious that a [municipality] could be held liable under § 1983 without proof of a pre-existing pattern of violations." Connick, 131 S.Ct. at 1360.

### C. False Imprisonment

Where a claim of false imprisonment under Michigan law centers around a false arrest, the court must consider whether there has been a false arrest.[9] In order to prove

---

[9] For further clarification, see Lewis v. Farmer Jack Div., Inc., 415 Mich. 212 (1982). "False arrest and false imprisonment as causes of action are said to be distinguishable

9

false arrest under Michigan law, a plaintiff must show that the defendant "participated in an illegal and unjustified arrest, and that [the defendant] lacked probable cause to do so." Walsh v. Taylor, 263 Mich. App. 618, 626 (2004) (citing Peterson Novelties, Inc. v. Berkley, 259 Mich. App. 1, 18 (2003)). When considering whether a false arrest has occurred, Michigan courts have made clear that "the guilt or innocence of the person arrested is irrelevant." Peterson Novelties, 259 Mich. App. at 18 (citation omitted). "Whether the plaintiff could actually have been convicted is irrelevant because actual innocence is not an element of false arrest." Id. (citation omitted). All that is required for a plaintiff to show is that "the arrest was not legal, i.e. the arrest was not based on probable cause" and was made "without legal authority." Id. (citations omitted). "Where the facts are undisputed, the determination whether probable cause exists is a question of law for the court to decide." Id. (citations omitted).

The Michigan Court of Appeals in Peterson Novelties explained probable cause:

> Probable cause that a particular person has committed a crime " 'is established by a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious person in the belief that the accused is guilty of the offense charged.' " People v. Coutu (On Remand), 235 Mich. App. 695, 708 (1999) (quoting People v. Tower, 215 Mich. App. 318, 320 (1996)). Probable cause is not capable of being precisely defined; rather, it is a commonsense concept

---

only in terminology. The difference between them lies in the manner in which they arise. It is not necessary, to commit false imprisonment, either to intend to make an arrest or actually to make an arrest. However, a person who is falsely arrested is at the same time falsely imprisoned, and an unlawful arrest may give rise to a cause of action for either false arrest or false imprisonment. Thus, it has been stated that false arrest and false imprisonment are not separate torts, and that a false arrest is one way to commit false imprisonment; since an arrest involves a restraint, it always involves imprisonment." Id. at 231 n.4 (Williams, J., dissenting) (citation omitted).

10

> dealing with practical considerations of everyday life that must be viewed from the perspective of reasonable and prudent persons, not legal technicians. Ornelas v. United States, 517 U.S. 690, 695-96 (1996).

259 Mich. App. at 19.

## IV. DISCUSSION

### A. Hartland's Motion

Count VI of the amended complaint claims Hartland is liable under 42 U.S.C. § 1983 under a failure to supervise theory. Specifically, Callahan says that the failure to train employees in crowd control led to Steinaway's use of excessive force and Alice's implementation of a suspension without due process. As best as can be gleaned from his papers, Callahan asserts three theories to support Hartland's liability: (1) Hartland has a written policy that is the "moving force" behind his claimed constitutional violations; (2) Hartland failed to train/supervise its staff in crowd control for the football game; and (3) Alice's actions in suspending Callahan before conducting a complete investigation amounted to "deliberate indifference."[10] Hartland says it is entitled to summary judgment because Callahan cannot prove it was the "moving force" behind his claimed constitutional deprivations. The Court agrees.

### 1. Callahan's Reliance on Hartland's Written Policy

Callahan points to a written Hartland policy that he says was the "moving force" behind his claimed constitutional violations. Callahan's reliance on Hartland's written policy

---

[10] Any attempt to hold Hartland liable under a municipal liability theory based on Steinaway's actions has no merit. Steinaway was employed and trained by, and reported to Livingston. Steinaway's actions cannot be attributed to Hartland; Hartland is not the "moving force" behind claimed constitutional deprivations suffered because of him.

entitled "Hartland Consolidated Schools Bylaws & Policies" is misplaced. Specifically, Callahan relies on an introductory paragraph of the bylaws and polices, which states,

> The Board of Education is committed to maintaining a safe school environment. The Board believes that school crime and violence are multifaceted problems which need to be addressed in a manner that utilizes the best resources and coordinated efforts of School District personnel, law enforcement agencies, and families. The Board further believes that school district administrators and local law enforcement officials must work together to provide for the safety and welfare of students while they are at school or a school-sponsored activity or while enroute to or from school, or a school-sponsored activity. The Board also believes that the first step in addressing school crime and violence is to assess the extent and nature of the problem(s), and then plan and implement strategies that promote school safety and minimize the likelihood of school crime and violence.

(Doc. 31-13, p. 2). Callahan says that this policy is vague and, therefore, leads to constitutional deprivations.

For Hartland to be liable, "[Callahan] must . . . demonstrate a direct causal link between the policy and the alleged constitutional violation in order to show that the municipality's deliberate conduct can be deemed the moving force behind the violation." Spears, 589 F.3d at 256 (citation and internal quotations omitted). Here, the policy shows that Hartland understood the need to "work together to provide for the safety and welfare of students." Callahan's reliance on this language of the policy to prove a direct casual link to his claimed constitutional violations directly undermines his position. Indeed, he points to Hartland's policy that explicitly recognizes the need to provide student safety in an attempt to prove the policy caused his constitutional violations. His claim has no merit.

### 2. Failure to Train/Supervise

Callahan's failure to train/supervise theory is also defective. He attempts to

12

establish that Hartland is the moving force behind his claimed injuries by (1) failing to train/supervise its employees regarding "crowd control," and (2) failing to train/supervise its employees on proper investigatory practice before issuing a suspension to a student. Callahan, however, did not individually sue Gordinear, Lashbrook, or Alice. He has not claimed in this lawsuit that they violated his constitutional rights. Nor can he. All he has stated is that Gordinear and Lashbrook told him he could not walk in a certain direction because they were keeping the crowd away from an injured person. That is not a constitutional violation. Callahan says Alice suspended him after Steinaway told her he assaulted Lashbrook. Suspending Callahan for ten days pending a complete investigation is not an action that amounted to a constitutional violation. See, e.g., Goss v. Lopez, 419 U.S. 565, 581-82 (1975) (finding due process to be satisfied when a student is suspended for 10 days or less after "oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story"). Without an underlying constitutional injury suffered by Callahan, there is no municipal liability that can attach to Hartland.

Even if Callahan had presented an underlying constitutional violation, he cannot show that Hartland's training/supervision was inadequate. Gordinear worked athletic events at Hartland for seven years; Lashbrook worked the same events for eight years. Even if they did not receive "formal" training recently, they have successfully been performing the same duties for several years. More importantly, Callahan fails to show that Hartland acted with deliberate indifference to his constitutional needs, i.e. (1) "a custom of tolerance or acquiescence of federal rights violations"; or (2) a "patently obvious" failure to train and/or supervise. Without showing deliberate indifference, Callahan cannot

establish that his rights were violated due to a "policy" or "custom" attributable to Hartland.

First, Callahan has not proffered any evidence showing a recurring pattern of constitutional violations that took place in the school district. In fact, Callahan has not presented evidence of <u>any</u> prior allegations of wrongdoing arising out of "crowd control" by an employee or failure to properly investigate a claim before suspending a student. As Hartland puts it, it could not be "deliberately indifferent to a problem which had never previously presented itself."

Second, this case does not present a situation where the failure to train employees in crowd control or failure to conduct a proper investigation before suspending a student was "patently obvious" to lead to a constitutional deprivation. <u>See, e.g.</u> <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 390 n.10 (1989) (hypothesizing single-incident liability where "the need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights").

In sum, Callahan has not proffered any evidence showing that Hartland is the "moving force" behind his claimed constitutional violations. Accordingly, Hartland is entitled to summary judgment and count VI of the complaint will be dismissed.[11]

### B. Livingston's Motion

Livingston moves for summary judgment on count VII of the amended complaint (failure to supervise). Callahan says Livingston is liable under a failure to supervise theory

---

[11] Callahan has not proffered any evidence to support a claim of improper hiring nor has he argued that theory of liability in his papers and at oral argument. Hartland is not liable under an improper hiring theory.

14

for Steinaway's claimed use of excessive force. Like Callahan's claim against Hartland, this claim has no merit.

Specifically, Callahan says:

> It is Plaintiff's position that the failure of Livingston County to properly supervise Steinaway's activity, when it was known that he had prior issues with violent behavior toward minors, and the failure to oversee the process by which Plaintiff was ultimately charged with a serious crime, constituted a deliberate indifference to the rights of Plaintiff and other similarly situated. The County's failure to act in this case resulted in a substantial deprivation of an important constitutional right.

(Doc. 46, p. 13) (citation omitted).

Essentially, Callahan says that Livingston, knowing that Steinaway was sued by a student for using excessive force when he worked for his former employer, should not have "placed Steinaway back into an environment where he was constantly exposed to teenagers" (Doc. 46, p. 13). At oral argument, Callahan's attorney said that Steinaway "wasn't the guy for the job." The fact that Steinaway was once sued by a student, however, is not enough to show that Livingston's training or supervision was inadequate. Steinaway had training at the police academy at Washtenaw Community College, training from his former employer, SRO and other training at Livingston, a specific one-week SRO training in Mount Pleasant, and SRO training from Hartland High School's prior SRO. In light of the specific and tailored training that Steinaway received <u>after</u> he was sued while working for a former employer, Callahan fails to make out a claim for failure to supervise and/or train.

Further, even if Callahan's claim had merit, he has not established that Livingston was deliberately indifferent to his constitutional rights, and, therefore, the "moving force" behind his claimed constitutional violations. First, one prior lawsuit cannot establish a well-

settled custom necessary to show deliberate indifference. See Jones v. Muskegon Cnty., 625 F.3d 935, 946-47 (6th Cir. 2010) (holding that "a jury could not reasonably infer from [five prior incidents] alone that the County had a widespread, permanent, and well-settled custom. . . ."). Second, Callahan cannot establish that there was a patently obvious failure to supervise/train. As explained above, Livingston provided Steinaway with specific training for his duties as a SRO. This training took place after Steinaway was sued while working for a different employer. Accordingly, Callahan cannot show that Livingston was the moving force behind his claimed constitutional violations and it is entitled to summary judgment.

### C. Steinaway's Motion

Steinaway moves summary judgment on count II of the amended complaint (false imprisonment). Although this claim is framed as one for false imprisonment, the underlying basis is Callahan's claim that he was falsely arrested. Thus, the Court will consider whether Steinaway can maintain a claim of false arrest under Michigan law.

Steinaway says Callahan's plea to disorderly conduct in state court precludes him from bringing a false imprisonment claim because it proves he had probable cause to initiate the arrest. The Court agrees.

The Michigan Court of Appeals has held that a conviction is conclusive proof of probable cause. Blase v. Appicelli, 195 Mich. App. 174, 178 (1992). In Blase, the court of appeals recognized that, "it is well established that a conviction, unless procured by fraud or unfair means, is conclusive evidence of probable cause." Id. (citing Moore v. Mich. Nat'l Bank, 368 Mich. 71, 73 (1962); Piechowiak v. Bissel, 305 Mich. 486, 497 (1943)). "The general rule applies to a conviction that results from a guilty plea." Id. (citing Killian v.

16

Fuller, 162 Mich. App. 210, 215 (1987)). Here, Callahan pleaded guilty to a lesser offense of disorderly conduct based on the actions that led to his arrest. See Devenpeck v. Alford, 543 U.S. 146, 153 (2004) (holding that the offense establishing probable cause to initate the arrest does not have to be "closely related" to or "based on the same conduct" as the offense identified by the arresting officer at the time of arrest.").

Callahan has not challenged that his guilty plea to disorderly conduct was procured by fraud. In his deposition testimony, Callahan stated that he felt "pressured" and scared that if he did not accept the plea deal, he would face harsher punishment (Doc. 50-6, p. 18). He says he was "too intimidated" to tell the judge (Id.). In the next breath, however, Callahan admitted that what he told the judge was true and that no one forced him to plead guilty (Id.). Accordingly, under Blase, Callahan's guilty plea is conclusive evidence of probable cause. Steinaway is entitled to summary judgment on the false imprisonment claim.

## V. CONCLUSION

For the reasons stated above, Hartland's motion for summary judgment is GRANTED, and Livingston and Steinaway's motion for partial summary judgment is GRANTED. Counts II (False Imprisonment- Steinaway), VI (Failure to Supervise- Hartland), and VII (Failure to Supervise- Livingston) are DISMISSED. Judgment will be entered in favor of Hartland and Livingston. The case proceeds against Steinaway only on counts I (Assault and Battery) and IV (42 U.S.C. § 1983 - Excessive Force).

SO ORDERED.

12-10774 Callahan v. Hartland Consolidated Schools, et al


                             S/Avern Cohn  
                             AVERN COHN  
                             UNITED STATES DISTRICT JUDGE

Dated: February 8, 2013

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, February 8, 2013, by electronic and/or ordinary mail.

                             S/Sakne Chami  
                             Case Manager, (313) 234-5160